

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | | |
|---|---|---|
| United States of America<br>v.<br>Gabriel Gonzales<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4-20-70327<br><br>MAG |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __March 9, 2020__ in the county of __Contra Costa__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & (b)(1)(B) | Possession with Intent to Distribute More than 50 grams of Methamphetamine |

This criminal complaint is based on these facts:

See Attached Affidavit of DEA Special Agent Joseph Pittaluga

FILED
MAR 13 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

☑ Continued on the attached sheet.

Approved as to form _____
AUSA Aseem Padukone

_____
Complainant's signature

Joseph A. Pittaluga, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/13/20

_____
Judge's signature

City and state: Oakland, California

Hon. Donna M. Ryu, U.S. Magistrate Judge
*Printed name and title*

Document No.
District Court
Criminal Case Processing

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR CRIMINAL COMPLAINT AND ARREST WARRANT

I, Joseph A. Pittaluga, a Special Agent of the Drug Enforcement Administration (DEA), being duly sworn, state:

## INTRODUCTION

1. I make this affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a criminal complaint and arrest warrant authorizing the arrest of Gabriel GONZALES, for possession with intent to distribute 50 grams and more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(viii), on or about March 9, 2020, in the Northern District of California.

## SOURCES OF INFORMATION

2. This affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrant. I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts necessary to establish probable cause that violations of the federal laws identified above have occurred.

3. I have based my statements in this affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents and law enforcement officers, information provided by reports of other law enforcement officers, information provided by video and photographic evidence, and information provided by records and databases. I believe these sources to be reliable. Where I refer to conversations and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted. This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds. My experience and training as a DEA Special Agent and my participation in this investigation form the basis of the opinions and conclusions set forth below.

## AFFIANT BACKGROUND

4. I am a DEA Special Agent and I have held this position since August 2016. I investigate drug trafficking organizations as a member of the DEA, San Francisco Field Division, Oakland Resident Office. Prior to my employment with DEA, I was a sworn law enforcement officer with the St. Petersburg Police Department in St. Petersburg, Florida, for approximately eleven years. For approximately eight of those years, I was a detective in the Narcotics Division.

5. I received twenty weeks of specialized drug law enforcement training at the DEA training academy in Quantico, Virginia, from September of 2016 to February of 2017. The training covered all aspects of drug investigations, including identification of controlled substances, physical and electronic surveillance, utilization of confidential sources, interview techniques, undercover operations, financial investigations, money laundering techniques, and the general operation of drug trafficking organizations.

6. Over the course of my law enforcement career, I have participated in hundreds of investigations of illicit drug traffickers, including complex conspiracies. These investigations have involved the use of undercover officers, confidential informants, physical surveillance, and investigative interviews, which have led to the execution of search warrants and arrest warrants at both the state and federal level. I have participated in the execution of hundreds of warrants to search locations for controlled substances, related paraphernalia, firearms, and other evidence of violations of both state and federal narcotics statutes. I have participated in multiple wire investigations at the state and federal level. I have been actively involved as the case investigator in state and federal investigations and have talked with multiple confidential informants involved in drug trafficking. I have been the affiant for both state and federal search warrants related to investigations of narcotics trafficking offenses. My work in these areas has resulted in arrests of numerous offenders at the state and federal level, seizures of bulk narcotics, narcotic supplies, and assets. In the course of these investigations, I have acted in an undercover capacity, purchasing crystal methamphetamine, heroin, cocaine base, cocaine powder,

prescription medications, MDMA, and marijuana. Moreover, I have participated in, planned, and/or supervised numerous instances of physical surveillance and electronic surveillance. I have conducted interviews of defendants at the time of their arrest, and I have debriefed and interviewed informants and other non-defendants with respect to drug investigations. Specifically, I have interviewed numerous defendants and informants who have participated in methamphetamine and cocaine trafficking by Mexican drug trafficking organizations ("DTOs").

7. As a result of my participation in these and other activities, I have gained particular knowledge in the use and utility of undercover agents, confidential informants, physical surveillance, wire surveillance, electronic surveillance, oral surveillance, consensual recordings, investigative interviews, mail covers, trash searches, installation and monitoring of GPS tracking devices, pole-mounted cameras, and the execution of federal and state search and arrest warrants. In addition to using the aforementioned investigative techniques, during these investigations, I also have analyzed information from traditional record sources, such as telephone toll and subscriber records, as well as non-traditional record sources, such as the informal ledgers routinely maintained by drug traffickers listing amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources. I have also gained expertise in the identification and collection of drug and non-drug evidence, and the analysis and the interpretation of recorded conversations. Additionally, I have spoken extensively with other experienced law enforcement officers and cooperating individuals about the packaging and preparation of drugs, methods of operation, and security measures employed by drug traffickers.

8. Through my involvement in drug investigations, discussions with other law enforcement personnel, classroom and field training, discussions with confidential informants, and arrest interviews of defendants involved in the trafficking of controlled substances, I have become familiar with the methods used by drug traffickers to import, transport, safeguard, and distribute drugs, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds. Specifically, I have participated in more than ten state and federal

investigations that employed court-authorized wire interceptions in narcotics and/or money laundering investigations. The majority of the wiretap investigations in which I have participated involve organizations trafficking cocaine, heroin, and methamphetamine. During these investigations, I have reviewed hundreds of line sheets (summaries of intercepted conversations) or transcripts (written verbatim accounts of intercepted conversations) of drug-related conversations. I have confirmed the meaning of drug-related intercepted conversations with the targets themselves in post-arrest debriefings. I have participated in hundreds of hours of surveillance, observing, and recording the movements of persons trafficking in drugs who were targets of wiretap interceptions. As such, I was able to compare the content of the intercepted conversations with the actual movement and action of the persons intercepted on the wiretap.

9. I have personally participated in the investigation discussed in this affidavit as the lead case agent, and I am familiar with the facts and circumstances of the investigation. My role in this investigation, combined with my training and experience, information I have learned from other DEA agents and other law enforcement agencies, my discussions with witnesses involved in the investigation, and my review of records and reports relating to the investigation form the basis for the opinions I set forth in this affidavit. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another DEA agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

## APPLICABLE STATUTES

10. Title 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii) prohibits a person from knowingly possessing 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, with the intent to distribute it to another person.

11. The elements of the Target Offense (21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(viii))

4

are as follows: (1) the defendant knowingly possessed 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, and (2) the defendant possessed it with the intent to distribute it to another person.

## FACTS SUPPORTING PROBABLE CAUSE

12. On or around March 9, 2020, San Pablo Police Department (SPPD) officers were dispatched to a residence on Road 20 in San Pablo, California (hereinafter the "Target Residence"), in response to a 9-1-1 call reporting a domestic dispute. The 9-1-1 caller had reported that his father, Gabriel GONZALES, was holding his mother, TB, hostage in their living room with a handgun. The reporting party, who is sixteen years old, reported that he was in a bedroom with his sister.

13. SPPD officers arrived on scene and established a perimeter around the residence. After officers arrived, TB walked out the front door of the residence. The reporting party and his sister were able to leave the residence through a bedroom window. GONZALES remained in the residence for over an hour before surrendering to SPPD. While GONZALES was refusing to leave the residence, TB spoke with officers. She told officers that GONZALES suspected her of cheating on him. Earlier in the evening, she was trying to leave for work when he started an argument, searched through her vehicle and her phone, and chased her down the street. TB said that GONZALES had threatened that it would not be good for her if he found something on her phone, which she thought meant he would hurt her. TB told SPPD that GONZALES had firearms. SPPD officers observed that TB appeared upset and was hesitant in answering questions.

14. After GONZALES surrendered, officers breached the front door of the residence (which was locked) and conducted a protective sweep of the residence. The residence was then secured.

15. Later, at the police station, SPPD took additional statements, including one from the reporting party and one from TB. The reporting party told officers that he received a call from his brother before the incident, asking him to check on their mother because their father had

hit her.[1] The reporting party went to the living room and saw his mother, TB, sitting on the couch and saw that her face was red. GONZALES was standing by the front door holding a handgun, which he then placed into his waistband. TB whispered to the reporting party to call 9-1-1 while GONZALES was looking out the front door. The reporting party went to his bedroom, bringing his sister there in the process, where he called 9-1-1. The reporting party told SPPD that GONZALES was upset about TB leaving for a trip to Arizona because he believed she was cheating on him. The reporting party told SPPD that in addition to the gun he saw GONZALES holding in the living room, GONZALES had an "AK" pellet gun in the garage, a black pistol in his dresser drawer, and a black shotgun. The reporting party told SPPD that GONZALES had built a room inside the garage which had two couches and the "AK" was on one of the couches.

16.     TB told SPPD that she had been married to GONZALES for nine years and that they had four kids together. TB said that GONZALES suspected that she was cheating on him and he stopped her as she was trying to leave for work and questioned her, shouted at her, and searched through her phone. TB got out of the car and ran away from GONZALES, hoping that someone would intervene. She eventually returned to the vehicle and GONZALES searched it. GONZALES's cousin arrived and tried to break up the dispute but GONZALES told him not to get involved and he left. The dispute moved into the residence, where GONZALES began unpacking a suitcase TB was packing for her trip to Arizona. TB whispered to her son to call the police. Later, the police arrived. GONZALES asked TB to go outside and see what the police wanted. TB denied that GONZALES had pulled a gun on her and said that she did not see a gun on GONZALES during the incident. SPPD observed a two to three inch raised red mark on the front of TB's neck. TB said that she had just argued with GONZALES and their physical altercation was limited to GONZALES grabbing her hoodie strings when she was in her car. TB said she did not want to file charges against GONAZALES. The SPPD officer that interviewed

---

[1] The reporting party did not know how his brother knew this, as he was not at the residence.

6

TB concluded that she was minimizing GONZALES's conduct because she was scared of him and that she was not truthful about the severity of the altercation and whether GONZALES held a gun during it.

17. SPPD obtained a search warrant from Contra Costa County Superior Court for the residence, which authorized the search of the residence for, among other things, firearms, including containers large enough to contain firearms.

18. Officers executed the search warrant just after midnight the same evening (now March 10, 2020). Officers found a loaded Smith & Wesson SD40 VE handgun in the freezer underneath the ice tray. They also found multiple boxes of ammunition in one of the bedrooms.

19. In the garage, officers discovered that a corner was walled off to create a makeshift room. The room had two couches, small tables, and shelves. In the room, officers found an unlocked safe containing methamphetamine and cocaine. Subsequent presumptive testing, utilizing a NIK test kit, confirmed that the suspected narcotics seized from the safe were methamphetamine and cocaine. The methamphetamine was packaged in two, gallon-size zip lock bags and one, sandwich-size zip lock bag. The gross weight of the methamphetamine is approximately 1,700 grams. The cocaine was packaged in one, gallon-size zip lock bag. The gross weight of the cocaine is approximately 340 grams. Based on my training and experience, individuals that possess controlled substances in quantities this high possess the substances with the intent to distribute them to other people. A photo of the drugs, along with the firearm found in the freezer, is reproduced below:



20. In the makeshift room, officers also found a Wal-Mart employee name tag with "Gabriel" written on it. According to the reporting party, GONZALES used to work at Wal-Mart and the name tag belonged to him. Officers also found two player's cards from casinos in California with the name Gabriel Gonzales. While one of GONZALES's sons shares his name and also lives in the house, I believe these cards belonged to GONZALES (and not his son) based on the fact that his son is under 21 years old and therefore cannot legally gamble at the relevant casinos. Based on my training and experience, the fact multiple items with GONZALES's name on them were found in the makeshift room, and the reporting party's statement that GONZALES built the makeshift room, I believe that GONZALES knowingly possessed the drugs that were found in the safe. Officers also found a pellet gun that resembled an AK-47 rifle and crossbows in the makeshift room.

21. Officers found two digital scales in the garage outside of the makeshift room. Based on my training and experience, individuals who sell controlled substances use digital scales to weigh sale-size portions of drugs to ensure that they are providing customers with the correct amount of the controlled substance.

22. Based on my training and experience, the packaging of the drugs, the quantity of the drugs, and the presence of digital scales in close proximity to the drugs, I believe that GONZALES possessed the methamphetamine and cocaine for purposes of distribution and the drugs were not for his own personal use.

## REQUEST TO SEAL

23. The DEA's criminal investigation of GONZALES and others associated with the criminal conduct is ongoing. In addition, it is my belief that prematurely revealing the specific details, facts, and reasons for the search, as detailed in this affidavit, may cause flight from prosecution, destruction of or tampering with evidence, intimidation of potential witnesses, and otherwise seriously jeopardize the investigation (e.g., prompting changes in behavior or notification of confederates). Accordingly, I request that the Court issue an order that the criminal complaint, this affidavit in support of the application for criminal complaint and arrest

8

warrant, the application for the criminal complaint and arrest warrant, and the attachments thereto, along with the order itself, be filed under seal until further order of the Court.

## CONCLUSION

24. On the basis of my participation in this investigation and the information summarized above, I have probable cause to believe that on or about March 9, 2020, in the Northern District of California, GONZALES knowingly possessed with intent to distribute 50 grams and more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(B)(viii).

JOSEPH A. PITTALUGA
Special Agent
Drug Enforcement Administration

Subscribed and sworn before me on this 13th day of March, 2020.

HONORABLE DONNA M. RYU
United States Magistrate Judge