DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

NOAH STERN (CABN 297476)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7230
    Fax: (415) 436-7234
    Noah.Stern@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | ) **CASE NO. 4-20-70327 MAG** |
|---|---|
| Plaintiff, | ) UNITED STATES' *EX PARTE* APPLICATION FOR A STAY OF, AND MOTION TO REVOKE THE MAGISTRATE COURT'S PRE-TRIAL RELEASE ORDER |
| v. | |
| GABRIEL GONZALES, | |
| Defendant. | |

On May 15, 2020, Magistrate Judge Donna M. Ryu authorized the pre-trial release of Gabriel Gonzales. Magistrate Judge Ryu ordered that Gonzales be released to the custody of his mother on home confinement with location monitoring and other conditions. The government opposes Gonzales's release on the ground that he poses a serious danger to the community and is a flight risk. The government requested a stay of the release order, which Magistrate Judge Ryu granted, but only until 3 p.m. today, May 15, 2020, given the upcoming weekend. The government makes this emergency application for a stay of the release order and also moves to revoke it.

On March 9, 2020, Gabriel Gonzales held his wife prisoner in their family living room with a handgun. One of the couple's minor sons called 9-1-1 while hiding in his bedroom. San Pablo police

UNITED STATES' *EX PARTE* APP. FOR STAY AND MOTION TO REVOKE RELEASE ORDER
4-20-70327 MAG      1

responded to the home and a standoff ensued.  Gonzales allowed his wife to leave through the front door soon after police arrived.  His son fled through the bedroom window, fearing that Gonzales would shoot him.  Gonzales's daughter, who was also in the house, left through the front door.  Gonzales refused to leave the house.  Gonzales only surrendered to police over an hour and a half after they arrived, after negotiating with police and family members.  Police later obtained and executed a search warrant for the home and found a loaded Smith & Wesson SD40 VE handgun in a freezer (which had been reported stolen).  In a makeshift room in the garage, officers found approximately 1,700 grams (gross) of methamphetamine, along with cocaine, a pellet gun resembling an AK-47 rifle, and other evidence.

Gonzales was charged in Contra Costa County with felony counts of False Imprisonment by Force or Menace, Corporal Injury on a Spouse, Child Abuse, and Possession of a Controlled Substance for Sale, and a misdemeanor count of Receipt of Stolen Property, and was detained on $130,000 bail. On March 13, Magistrate Judge Donna Ryu signed a complaint charging Gonzales with one count of Possession with Intent to Distribute More than 50 Grams of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

On the eve of the preliminary hearing in Gonzales's state case, one of the necessary law enforcement witnesses came into contact with a person who had tested positive for COVID-19 and was forced to self-quarantine.  The state was unable to go forward with the preliminary hearing, which had been scheduled for May 7, 2020.  Because the officer was scheduled to self-quarantine past the deadline for holding the preliminary hearing, the state decided to dismiss the case and allow the federal case to proceed.  The state dismissed its case on May 11, 2020 and, the same day, Gonzales was released from state custody and taken into federal custody.

Pre-trial services recommended that the defendant be released to the custody of his mother, but its report did not, in the government's view, fully take into account the nature and circumstances of the instant offense.  Moreover, according to the report, Gonzales's mother stated that he has been living with her for the last year and a half, suggesting she does not have the ability to safeguard the community from Gonzales.  That statement is also inconsistent with evidence that Gonzales was living at the family home where the incident occurred,[1] which is only a twelve minute drive away.

---

[1] At the detention hearing, defense counsel proffered that the defendant had been back and forth

Title 18, United States Code, Section 3145(a) allows the government to "file, with the court having original jurisdiction over the offense, a motion for revocation of the [release] order." The Court should grant a stay of the release order, which is effective within hours, to allow the Court to consider the government's motion to revoke and order a briefing schedule on the government's motion. Gonzales is a danger to the community and a flight risk. His conduct on March 9 of this year was not an aberration and the risk to the community and his family is simply too great to allow his release.

## I. Legal Standard

"[A] district court's review of a magistrate's detention order is to be conducted without deference to the magistrate's factual findings." *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir. 1990).

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B). A finding that a defendant presents a risk of non-appearance need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406. It is presumed, however, that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant and the safety of the community when the defendant is charged with an offense under the Controlled Substances Act for which the maximum term of imprisonment is ten years or more. 18 U.S.C. § 3142(e)(3)(A).

"[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Consideration of factors outside the articulated factors set forth in Section 3142 is disfavored. *Id.*

---

between his mother's residence and the family home.

## II. This is a Presumption Case and it is the Defendant's Burden to Show That There Are Conditions of Release that Could Safeguard the Community and Ensure His Appearance

A judicial officer found probable cause that Gonzales committed the crime of possessing with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). The maximum prison sentence for the charged offense is 40 years in prison under the Controlled Substances Act. Therefore, pursuant to the Bail Reform Act, it is presumed that Gonzales is a danger to the community and risk of flight and that no combination of conditions can reasonably safeguard the community and ensure his appearance. *See* 18 U.S.C. § 3142(e)(3). Based on the information available to the government, the defendant will not be able to rebut this presumption. Indeed, the nature and circumstances of the offense charged, the weight of the evidence, Gonzales's history and characteristics, and the nature and seriousness of the danger Gonzales poses to his immediate family underscore that there are no combination of conditions that can safeguard the community and ensure his appearance. *See* 18 U.S.C. § 3142(g).

## III. The Nature and Circumstances of the Charged Offense and Weight of the Evidence Strongly Support Detention

On March 9, 2020, Gabriel Gonzales suspected that his wife was cheating on him.[2] He confronted her in the late afternoon as she was leaving for work, shouted at her and searched through her phone. She ran from him into the street, hoping that someone would intervene. Gonzales chased her and threatened her. Gonzales's cousin arrived during the altercation and tried to break up the dispute, but he left after Gonzales told him not to intervene. The dispute moved to the home. Gonzales stood by the front door, guarding it, and told his wife she could not leave. As he guarded the door he held a Glock-style handgun. During this time, one of Gonzales's minor sons entered the room and Gonzales's wife whispered to her son to call 9-1-1.

Gonzales's son went to his room and called 9-1-1 to report that Gonzales was holding his mother hostage with a pistol in the living room of their home. San Pablo police responded to the house,

---

[2] The facts in support of the government's memorandum are drawn from the Affidavit of Joseph Pittaluga in Support of an Application for a Criminal Complaint and Arrest Warrant, *see* Dkt. No. 1, as well as San Pablo Police Department reports.

established a perimeter, and requested air support. Gonzales then allowed his wife to leave and she exited the house with her hands up. 9-1-1 advised Gonzales's son to lock his bedroom door. The boy told 9-1-1 that there was no lock on his door and Gonzales was calling for him. Gonzales's son fled the home through his bedroom window. He later told officers that he though Gonzales would shoot him. Gonzales's minor daughter was also in the house during the stand-off and she left the house through the front door. Gonzales refused to leave the house. At one point, Gonzales appeared to be locking all of the windows and turning off the lights. Then a few minutes later, he left the house and surrendered to officers.

During the altercation, Gonzales appears to have struck his wife. Gonzales's son told officers after the incident that he had gone to the living room because his brother had called him to ask him to check on their mother because Gonzales had hit her. When Gonzales's son went to the living room, his mother was sitting on the couch and her face was red. When officers interviewed Gonzales's wife, they observed a two- to three-inch raised red mark on the front of her neck. Gonzales's wife claimed that the physical altercation was limited to Gonzales grabbing her hoodie strings when he initially confronted her, but officers concluded that she was likely minimizing the severity of the altercation because she was afraid of Gonzales.[3]

Officers executed a search warrant on the home later the same evening. They found a loaded Smith & Wesson SD40 VE handgun in the freezer underneath an ice tray. The firearm matched the description that Gonzales's son gave for the firearm that he had seen Gonzales holding in the living room. In a makeshift room in the garage, officers found approximately 1,700 grams gross of methamphetamine and approximately 340 grams gross of cocaine, as well as Gonzales's Wal-Mart employee ID and two casino player's cards bearing his name. Gonzales's son said that Gonzales had built the makeshift room and it was where he kept a pellet gun resembling an AK-47 rifle. Officers found this pellet gun in the makeshift room. Officers also found multiple boxes of ammunition in one of the bedrooms.

The facts surrounding Gonzales's arrest demonstrate that he is a danger to the community and

---

[3] Gonzales's wife also stated that she did not see Gonzales with a gun during the dispute.

specifically to his wife and immediate family. After an altercation with his wife, he held her prisoner with a gun. The gun was either loaded at the time he held her prisoner or he loaded it at some point during his over hour-long standoff with San Pablo police. This conduct put Gonzales's wife and son in extreme danger. By failing to surrender to police, Gonzales also created an extremely dangerous situation during which he or an officer could have been injured or killed. Indeed, during the standoff two pitbulls charged through the open front door of the home at officers, causing one of them to discharge a less-lethal round at one of the dogs.

Gonzales is now facing a five-year mandatory minimum prison sentence (and a 40-year maximum sentence) on the offense charged in the complaint. Moreover, the facts alleged in the complaint provide the factual basis for a charge under 21 U.S.C. § 841(b)(1)(A) with a 10-year mandatory minimum prison sentence. Gonzales may believe that his wife and/or son are responsible for the fact that he faces this serious criminal case and he may seek to punish them for that. Gonzales resorted to threats and violence in response to his belief that his wife was cheating on him; there is no reason to believe he would not respond with similar violence if he believed she (or his son) were responsible for him going to prison for over five years.

Further, if Gonzales is released he is likely to flee rather than face the significant mandatory minimum prison sentence that he is charged with. And if he does flee, Gonzales has shown that he is not afraid to engage in a standoff with officers, and apprehending him may be very dangerous.

**IV. Gonzales's History and Characteristics Support Detention**

Gonzales's history shows that the incident described above was not a one-off aberration. Although his criminal record is not long, statements from his family members suggest that his prior violent conduct is not fully captured by it.

Gonzales's criminal history report shows that he has been arrested for domestic violence related incidents in the past. According to the report, he was arrested in 2005 for Inflicting Corporal Injury on a Spouse or Cohabitant in violation of California Penal Code § 273.5, Possessing/Manufacturing/Selling a Dangerous Weapon, in violation of California Penal Code § 12020(a), and Possession of a Controlled Substance for Sale in violation of California Health and Safety Code § 11378. Gonzales was convicted of a misdemeanor count of Manufacturing/Possessing a Dangerous Weapon and sentenced to 60 day jail

and 3 years probation.  In 2009, Gonzales was arrested for Rape: Victim Incapable of Consent, in violation of California Penal Code Section 261(a)(1) and False Imprisonment, in violation of California Penal Code Section 236, although no charges were filed stemming from the arrest.

According to reports of interviews of his children, one child said there was a prior incident in which Gonzales pulled a knife on his mother.  Another child said that she saw Gonzales hit her mother.  It is not clear whether these are separate incidents or the same; but the incident(s) described were not the one that led to Gonzales's 2005 arrest and appear not to have been reported to police.

**V.     The Bond Conditions Are Not Sufficient to Ensure the Safety of the Community or the Defendant's Appearance**

Magistrate Judge Ryu ordered Gonzales released to the custody of his mother on home confinement, with orders not to contact his wife, along with other conditions.  These conditions are not sufficient to safeguard Gonzales's wife and children or the community.  While Mr. Gonzales's mother is likely well meaning, she appears to be unable to prevent future episodes as evidenced by the fact that, according to her, Mr. Gonzales was living with her on March 9 and her belief that that Gonzales and his wife were on good terms.  According to the defense's proffer, the instant offense was a one-off aberration caused in part by the defendant's methamphetamine use, and will not recur because Gonzales has been off drugs while in prison.  But the risk that Gonzales could relapse, or otherwise hold his family accountable for his legal troubles, is too significant to allow for his release and the danger it would cause.[4]

**VI.    Conclusion**

The facts here, far from rebutting the presumption applicable to him, show that Gonzales is a

---

[4] Without submitting documentation, the defense also argued that the defendant's serious health conditions warrant his release.  The government acknowledges that the defendant appears to have health conditions that make him higher risk for COVID-19, but nothing about those conditions reduces the defendant's danger to the community and his family or the risk of his non-appearance in court.  As other magistrate judges of this Court have found, the COVID-19 pandemic does not meaningfully shift the balance of the § 3142(g) factors in defendant's favor.  *See, e.g.*, *United States v. Trujillo*, No. 20-CR-00028-EJD-1 (SVK), Dkt. 15 (N.D. Cal.); *United States v. Sanchez*, No. 19-CR-00576-VC (JSC), Dkt. 23 (N.D. Cal.) (oral order denying bail motion premised on COVID-19 concerns); *United States v. Traore*, No. 20-CR-029-VC (JSC), Dkt. 28 (N.D. Cal.) (same); *United States v. Campos*, No. 19-CR-0280-RS (JSC), Dkt. 95 (N.D. Cal.) (same).  *But see In the Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-MJ-71055-MAG-1 (TSH), Dkt. 115 (granting motion for release premised on COVID-19 concern in extradition proceeding, with different standards for release than under the Bail Reform Act, where defendant was more than 70 years old).

danger to the community and a risk of flight.  All of the relevant § 3142(g) factors support detention.  The circumstances of the offense were violent and dangerous and involved a loaded firearm, a standoff with the police, and the trafficking of a large quantity of drugs.  The weight of the evidence is strong: the drugs were found in a makeshift room Gonzales built in close proximity to items bearing his name.  Gonzales's history and characteristics show that the instant conduct was not a one-off and there is no assurance that he would not engage in similar violent conduct if released.  Finally, the danger to Gonzales's family is particularly serious based on his past violence, his bringing of firearms and significant drug trafficking activity into the home, and the possibility that he will blame his wife and/or son for this serious criminal case.  For these reasons, there is also no surety that could adequately guard against the danger Gonzales poses to his family and the community or ensure his appearance.

For the foregoing reasons, the United States respectfully requests that this Court stay the release order and order briefing on the government's appeal.  There are no conditions of release that would reasonably assure defendant's appearance or the safety of the community.  *See* § 3142(f).

DATED: May 15, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

 */s/ Noah Stern*
NOAH STERN
Assistant United States Attorney